Herman SABEL et al., Plaintiffs,

v.

The WICKES CORPORATION, a Michigan Corporation, Defendants.

Herman SABEL et al., Plaintiffs,

v.

SEARS, ROEBUCK & COMPANY, a New York Corporation, Defendants.

Herman SABEL et al., Plaintiffs,

v.

LOWE'S OF CHARLESTON, INC., a South Carolina Corporation, Defendant.

QUESTOR CORPORATION, a Delaware Corporation, Plaintiff,

v.

Herman SABEL et al., Defendants.

Civ. A. Nos. 69-805, 70-213, 70-212 and 70-320.

United States District Court, D. South Carolina, Charleston Division.

Dec. 31, 1971.

T. Russell Foster, Charleston, S. C., Klyde Robinson and Geddes H. Martin, Charleston Heights, S. C., for Herman Sabel and others.

Thomas S. Tisdale, Jr., Charleston, S. C., and J. William Freeman, Akron, Ohio, for The Wickes Corp., Sears, Roebuck & Co., and Questor Corp.

## ORDER

MARTIN, Chief Judge.

This case is a consolidation of three patent infringement suits and a declaratory judgment suit. All the suits involve the infringement of the same patent, #3,115,958, issued December 31, 1963. All the structures that allegedly infringe the patent were manufactured by Questor Corporation, a successor to Locke Manufacturing Company. Questor assumed control of the litigation throughout. The declaratory judgment action by Questor was given control of procedure.

The declaratory judgment defendants are the three Sabel brothers, Herman, Leon and Arnold, who are joint patentees and owners of patent 3,115,958.

The 1952 Patent Act sets out the conditions of patentability in three sections under Title 35. An analysis of these sections indicates that patentability is dependent upon three explicit conditions: novelty and utility as provided in § 101 and § 102, and nonobviousness as set out in § 103. The pertinent section in this controversy is § 103 which provides:

§ 103. Conditions for patentability; non-obvious subject matter.

A patent may not be obtained though the invention is not identically disclosed or described as set forth in

section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The patent involved in this controversy relates to a highly successful component employed in conjunction with buildings or the like and more particularly to a column structure of an ornamental nature. The record reveals that, prior to the Sabel column, ornamental columns were constructed of cast iron or wrought iron. Usually the ornamental pattern was welded to the side frame. Such structures have been put to many different uses such as porch railings, stair railings, room dividers and many other orientations where it is desired to have an ornamental and decorative structural column. The record reveals that the cast iron colums are brittle, heavy and expensive. Wrought iron columns are brittle, heavy and expensive. Wrought iron is cheaper but the design is of poor quality. It was the primary objective of the Sabel brothers to provide an ornamental column which would be light in weight, easy to install, rigid and decorative.

The distinctive features of the Sabel column are that it is made of sheet metal which makes the ornamental panel lighter and stronger than the cast iron. Also the Sabels used die stamping to mass-produce the columns. Flanges are used on each side of the ornamental pattern. The flange is formed integrally with the pattern and rigidifies the assembly. The flanges also give strength to the columns and provide multiple welding points to attach the ornamental panel to the side frame by using resistance welding. The Sabel brothers made the ornamental surfaces concave and convex to produce a three dimensional effect. The edges of the ornamentation were turned inward to strengthen the ornamental pattern and to prevent injury from the sharp edges of the ornamentation. Tabs are formed integrally with the ornamental pattern and connect the pattern to the flange. To enable the columns to be formed in progressive dies there are notches on the flanges.

The Sabels contend that their patent is a combination of elements cooperating in a unique manner to produce a totally new and unexpected result in an ornamental column. The validity of a combination patent depends upon whether it was obvious to one possessing ordinary skill in the art to piece together the combination in the same way as did the inventor. If such obviousness is present the law will not favor granting the claiming inventor a monopoly. Marston v. J. C. Penney Co., 353 F.2d 976, (4th Cir. 1965); Cert. denied, 385 U.S. 974, 875 S.Ct. 515, 17 L.Ed.2d 437.

The obvious-nonobvious test was resolved in Graham v. John Deere, 383 U. S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

In applying the test to this case this Court concludes that the putting together of all the elements in the combination would be obvious to those of ordinary skill in the art.

Mr. Kamphoefner, Dean of the School of Design at North Carolina State University, who testified as an expert witness for the Sabel brothers, admitted that progressive die stamping was an old, well known technique in the metal art and that the only way to progressively advance material in die stamping was to use notches as the Sabels did. The Dean also testified that anyone who knew anything about mechanics knew

that the flange being bent from the edge of the pattern panel perpendicularly added strength and rigidity to the panel. As to the inturned edges of the ornamentation, the Dean testified that anytime you bend metal you get strength. The Dean also testified that the tabs on the Whittemore patent had the same purpose as the Sabel patent.

The primary reason for the success of the Sabel column was the substitution of sheet metal for the wrought iron and cast iron. Sheet metal was an obvious alternative to one working in the metal works and the substitution enabled the Sabels to mass produce the columns using progressive die stamping. The substitution of sheet metal also resulted in a lighter, more rigid column. It has long been established that the substitution of one material for another is not patentable. Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683 (1851). Pollard v. American Phenolic Corp., 219 F.2d 360 (4th Cir. 1955).

■■ The Court is well aware of the presumption of validity of the patent under 35 U.S.C. § 282, but the presumption is weakened because of the failure of the patent examiner to properly consider the pertinant prior art. Blumcraft of Pittsburg v. Citizens and Southern National Bank, 407 F.2d 557 (4th Cir. 1969). The Court is also aware of the commercial success of the column but commercial success alone does not make invention. Anderson—Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

The defendants objected to the testimony and evidence introduced through the witnesses Everett Kooi and Harvey Yellin because the 30-day notice required under 35 U.S.C. § 282 was not properly given. The defendants' objection is sustained and the Kooi and Yellin testimony was not considered by this Court.

It is the decision of this Court that the Sabel patent fails to meet the statutory requirements under 35 U.S.C. § 103 as to nonobviousness and is therefore invalid.

It is so ordered.